IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


CHARLES DIXON,            )
                              )
        Plaintiff,     )
                              )
       v.             )          1:11CV54
                              )
FLOWERS BAKING CO. OF    )
JAMESTOWN, LLC,       )
                              )
        Defendant.   )


## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This employment discrimination action comes before the Court on two Motions for Summary Judgment [Doc. #12, #23] filed by Defendant Flowers Baking Co. of Jamestown, LLC ("Defendant Flowers").[1]  In the first Motion for Summary Judgment, Defendant contends that Plaintiff's claims must be dismissed as a result of Plaintiff's intervening bankruptcy proceedings and his failure to disclose this claim in that proceeding.  In the Second Motion for Summary Judgment, Defendant contends that even if Plaintiff's claim is considered, there are no genuine issues of material fact and the action should be dismissed as a matter of law.  For the reasons set out below, the Court concludes that Defendant Flowers' first Motion for Summary Judgment should be granted in light of the intervening bankruptcy proceedings.  The Court also finds that, even if the matter were properly before the Court, there are no genuine issues of material fact, and that the action should be dismissed.

_____

[1] The parties have consented to the jurisdiction of the Magistrate Judge.  (Order of Reference [Doc. #33].)

I.     Facts, Claims, and Procedural History

Plaintiff Charles Dixon was employed by Defendant Flowers at Defendant's manufacturing and baking facility in Jamestown, North Carolina, where various bread products are produced.  Plaintiff was employed by Defendant as a Production Technician from 1994 until April 6, 2009, when his employment was terminated.  (Compl. [Doc. #4] ¶¶ 10, 11.)  From October 8, 2005, until his termination, Plaintiff specifically worked as a bread oven operator.  In that position, Plaintiff was required to check production schedules to verify the order in which various types of bread would be baked, monitor racks of bread dough that were rising (or "proofing"), set and operate oven temperatures, set equipment and add appropriate toppings as different varieties of bread were baked, and oversee the baking process.

Plaintiff suffers from asthma and breathing problems.  (Id. ¶ 6.) As a result of his asthma, Plaintiff uses an inhaler (a small, hand-held device that he puts to his mouth, seals his lips around, and inhales from) as well as an inhale chamber, which is similar to a face mask and is used in conjunction with his inhaler to help him get his "full dosage" of medication.  (Pl. Dep. [Doc. #23 Ex. A] at 13-15, 18.)  Plaintiff was allowed to use his inhaler at his workstation but not the inhale chamber.  (Id. at 17.)  Plaintiff states that he was told by Defendant's manufacturing manager, Mr. Rod Moore, that the chamber violated the company's policy on having "brittle plastic" at the workstation.[2]  (Id. at 18.)  Thereafter, he kept the chamber in his locker.  Plaintiff testified that he also uses a portable nebulizer which he was also allowed to

_____

[2] Plaintiff said that he knew that the brittle plastic regulation was part of the Food and Cosmetic Act of 1923, but disputes whether his chamber was "brittle plastic." (Pl. Dep. at 19.)  He said that it was never explained to him what was and was not "brittle plastic."  (Id. at 70.)

keep in his locker at work.  (Id. at 15.)  The portable nebulizer takes 5 minutes to use and allows him to breathe in a mist of medication.  (Id. at 15-16.)  The nebulizer requires an electrical connection and could not be used at his workstation because there was no electrical outlet there. (Id. at 16.)  In addition, the nebulizer produced a mist which apparently raised concerns regarding potential contamination of the bread if used at Plaintiff's workstation.[3]  Plaintiff did not recall ever asking anyone for permission to use his nebulizer at his work station.  (Id. at 119.)

Plaintiff was written up for various incidents during the time he worked on the bread line as an oven operator, including on December 9, 2006, in an incident when Plaintiff was not paying attention and allowed the bread to get too big, which Plaintiff admitted that he knew that he made a mistake; on June 30, 2007, when Plaintiff did not check the bread and adjust the times and as a result allowed the bread to get too big, which Plaintiff agreed occurred; on January 30, 2008, during an incident when Plaintiff did not read the card describing the bread type and the wrong toppings were put on the bread as a result of his oversight, which Plaintiff agreed occurred; on May 10, 2008, when he incorrectly read the card describing the bread type and ran the wrong type of bread, resulting in incorrect toppings; and on June 10, 2008, when he ran 4200 units with the wrong toppings.  (Id. at 81, 82, 84, 85-86 and Ex. #9, #10, #11, #12, #13.) Plaintiff testified that in February or March of 2009, he asked Rod Moore about being transferred to a position in shipping, but Plaintiff did not know of any specific job opening in

---

[3] Mr. Moore states in his declaration that he was told that Plaintiff had "placed a big plastic tube which we believed to be a nebulizer in the podium by his work area.  This device appeared to shoot a vapor mist into the air.  I told [Plaintiff] that he could not use this device at his work station because of [sic] the mist from the machine would contaminate the product and would be against regulations."  (Moore Decl. [Doc. #23 Ex. B] at 10.)  He says that Plaintiff agreed to keep the device in his locker.

that department.  (Id. at 123-24.)  Plaintiff said that Mr. Moore told him that he had too many write-ups to be transferred.  (Id. at 121, 124, 125.)

On March 4, 2009, Plaintiff received another incident report involving a failure to properly monitor the bread.  Plaintiff testified that this incident occurred when he had an asthma attack and had to leave the floor to use his nebulizer.  (Id. at 89.)  Plaintiff said that he tried to find a "break man" but could not and "got blamed for the bread being big." (Id. at 94.)  Plaintiff testified that he told his supervisor, Mr. David Chapman, that "there was about a 13-minute proof of where [he] had to use [his] inhaler" (Id. at 94.)[4]  According to Mr. Chapman, a "proof skip" occurs when the operator allows the bread dough to rise longer than normal to ensure that all of the dough catches up and rises to the appropriate levels. (Chapman Decl. [Doc. #23 Ex. D] at 6.)  According to the incident report for the March 4 incident, Plaintiff "put in a 13 min proof skip to let the bread rise," which resulted in "unusably short bread" coming out of the oven, followed a few minutes later by "very big bread."   The incident report notes a loss of 1,600 loaves of bread.  Plaintiff agreed that this incident "probably did cost" the company over 1,600 loaves of bread.  (Pl. Dep. at 95.)  He received a letter from Barbara DeBlaker, Director of Human Resources, advising him that if he violated company rules again before May 10, 2009, he would be subject to discharge.  (Id. Ex. 16.)

---

[4] In his declaration, Mr. Chapman contends that Plaintiff never told him "that he was having breathing problems or that he was unable to perform his job that day due to any underlying medical condition." (Chapman Decl. at 7.)  He further states that "at no time did [Plaintiff] tell me that any medical condition, such as asthma, caused him to step away from the line and/or fail to pay attention to the bread." (Id. at 9.)  For purposes of the present Motion, the Court has taken as true Plaintiff's contentions on this issue.

Plaintiff testified that he was written up again on April 5, 2009, by supervisor David Chapman.  (Id. at 102-03.)  The write-up states that Plaintiff got mixed up and changed the type of bread too early, causing the loss of 920 loaves of bread.  (Id. at 105-06, Ex. 17.)  It is not disputed that this mix-up presented the risk that the wrapping department would mistakenly wrap the bread in wrapping which did not list the correct allergens or ingredients, and thus cause a violation of FDA regulations.  (Chapman Decl. ¶ 22.)  This write-up included a notation that Plaintiff had received four work performance violations within a rolling 12-month period and that the company was terminating his employment as of April 5, 2009.  (Pl. Dep. at 103, Ex. 17.)  Plaintiff agreed that he had accumulated the required number of counselings to be terminated.  (Id. at 109.)   Rod Moore and Barbara DeBlaker were present when he was terminated.

Plaintiff testified that Defendant granted the only request for an accommodation that he made, which was to be able to carry his inhaler in his pocket.  (Id. at 17, 118.)  A doctor's note written on April 22, 2008, requested that Plaintiff not be assigned to mixing flour dough or gluten, and Defendant granted that request as well.  (Id. at 114-18, Ex. 18.)  When asked if there was any accommodation that Defendant could have made that would have allowed Plaintiff to continue performing his bread oven job, Plaintiff said that if they had left the ventilation system operating he "probably would have been okay."  (Id. at 126-27.)  He was told that during the period February through April the ventilation system could not operate because it would "mess up the bread."  (Id. at 127.)[5]  Mr. Moore states in his declaration that the ventilation system

---

[5] Plaintiff had previously noted that he kept his nebulizer at the plant "when they'd have the air cut off during the wintertime." (Pl.'s Dep. at 16.)

allows in ambient outside air and that during the winter months it is turned off because the cold air would excessively cool the bread and cause it to become dry, stale, and of poor quality. (Moore Decl. at 9.)  The ventilation system is turned back on around mid-April.  (Id.)  Fans are available for employees' use according to Mr. Moore, but he says that Plaintiff never requested a fan from him.  (Id. at 9-10.)

Plaintiff filed an EEOC charge of discrimination in June 2009, alleging that Defendant Flowers denied him reasonable accommodations for his health conditions, subjected him to a hostile working environment, and terminated his employment based on discrimination because of his medical conditions.  (Compl. ¶ 12.)  The EEOC issued Plaintiff Dixon a right-to-sue letter.  (Id. ¶ 14.)  Plaintiff Dixon filed his Complaint against Defendant Flowers in North Carolina state court in December 2010.  His First Cause of Action is that Defendant Flowers violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111, by : (a) discriminating against him in the terms, conditions, and privileges of employment because of his disability; (b) terminating his employment; (c) filling his position with someone outside of the protected class; and (d) denying a reasonable accommodation that would include allowing him to keep his inhaler in his work area and providing proper ventilation.  (Id. at 4-5.)  Plaintiff Dixon's Second Cause of Action is for injunctive relief in the form of an injunction preventing Defendant from engaging in disability discrimination, and requiring reinstatement and restoration of wages and other benefits.  (Id. at 5-6.) Defendant Flowers removed the action to this Court on January 25, 2011.

Plaintiff Dixon filed a Chapter 7 voluntary bankruptcy petition ("Petition") on February 12, 2011, after the present case had been removed to this Court. (Docket Sheet [Doc. #13-2].) As part of his Petition, Plaintiff Dixon filed several schedules listing his assets and income. Plaintiff Dixon listed his personal property on Schedule B and included in paragraph 21 a reference to a "Workers Compensation Claim" with a value of "Unknown." (Petition [Doc. #13-1] at 11.) Plaintiff also completed a Statement of Financial Affairs, which in Section 4 required him to list all suits and administrative proceedings to which he is or was a party within the one year immediately preceding the filing of his bankruptcy case. In the column where he was required to list the caption of the suit and case number, Plaintiff wrote "Workers Compensation." (Id. at 28.) For the nature of the proceeding, Plaintiff wrote "Pending Workers Compensation Lawsuit." (Id.) Plaintiff did not include any information in the columns where he was to provide the "court or agency and location" and the "status or disposition." (Id.) Finally, in his Claim for Property Exemptions, under the section for listing "Other Exemptions Claimed Under the Laws of the State of North Carolina," Plaintiff listed "Worker's Compensation benefits, N.C. Gen. Stat. § 97-21." (Id. at 15.) The Trustee concluded that there was no property available for distribution from the estate. The bankruptcy court entered an Order Discharging Debtor on May 23, 2011. (Discharge Order [Doc. #13-3].)

Defendant Flowers argues in its first Motion for Summary Judgment that Plaintiff Dixon failed to list this pending ADA action in his bankruptcy petition. According to Defendant Flowers, this failure has resulted in Plaintiff not having standing in this action, and/or being estopped from continuing to litigate it. Plaintiff Dixon argues that he has standing and that he

is not judicially estopped because the reference to a "workers' compensation" action in his Petition is a reference to this action and adequately describes this action. Defendant Flowers addresses the merits of Plaintiff's ADA claim in its second Motion for Summary Judgment.

II.     Discussion

A.      Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. The party moving for summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.)

B.     First Motion for Summary Judgment

In the First Motion for Summary Judgment, Defendant contends that Plaintiff's claims must be dismissed as a result of Plaintiff's intervening bankruptcy proceedings and his failure to disclose this claim in that proceeding.  Under federal bankruptcy law, upon the filing of Plaintiff's bankruptcy Petition, "'all legal or equitable interest of'" Plaintiff in property became property of his estate.  Detrick v. Panalpina, Inc., 108 F.3d 529, 535 (4th Cir. 1997) (quoting 11 U.S.C. § 541(a)(1)).  The trustee is the representative of the bankrupt's estate, and, thus, "succeeds to all causes of action held by the debtor at the time the bankruptcy petition is filed." Jones v. Harrell, 858 F.2d 667, 669 (11th Cir. 1988) (cited with approval in Detrick).  Once appointed, the trustee becomes the estate's "'proper party in interest,'" and is the only party authorized to act in such actions.  Detrick, 108 F.3d at 535 (quoting In re Richman, 104 F.3d 654, 657 (4th Cir. 1997)); see also Robertson v. Flowers Baking Co. of Lynchburg, 6:11CV00013, 2012 WL 830097 (W.D.Va. Mar. 6, 2012), aff'd, 474 F. App'x 242 (4th Cir. 2012); Harris v. hhgregg, Inc., 1:11CV813, 2013 WL 1331166 (M.D.N.C. Mar. 29, 2013).

Therefore, upon the filing of his bankruptcy Petition, all of Plaintiff's interest in this action was transferred from him individually to his estate.  Causes of action that belong to the estate may only be pursued by the trustee as representative of the estate.  Harris, 2013 WL 1331166, at *5-6.  In this case, the trustee never sought to intervene or otherwise administer this proceeding.  Plaintiff nevertheless contends that he subsequently regained his interest in this proceeding.  Plaintiff argues that during his bankruptcy proceeding, his "claims in this action

[were] abandoned by the Trustee" and thus reverted back to him pursuant to his discharge order. (Response [Doc. #15].)

Abandonment of property by the bankruptcy trustee is provided for by statute and is governed by the Federal Rules of Bankruptcy Procedure. The bankruptcy code provides that "[u]nless the court orders otherwise, any property scheduled under section 521(a)(1) [setting out the debtor's duties to file a list of creditors and certain schedules] of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." 11 U.S.C. § 554(c). The code also instructs that "[u]nless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate." 11 U.S.C. § 554(d). Bankruptcy Rule 6007 sets out the notice that a trustee must give for a proposed abandonment of property. As stated above, the parties disagree on whether Plaintiff Dixon properly "scheduled" this action in his bankruptcy proceeding so that it could be considered abandoned to the debtor under § 554(c).

In this case, Plaintiff's bankruptcy schedules made reference to a "workers compensation" action. Plaintiff in his Response brief contends that the reference to a "workers compensation" action should be construed as a reference to the present employment discrimination suit. There is no suggestion that Plaintiff had pending at the time any proceeding

other than the present action.[6] The question remains, however, whether Plaintiff's description was adequate.

Neither federal statutes nor the Fourth Circuit has established precise rules for determining whether a debtor's description of an asset is sufficient to consider it to have been "scheduled." See In re Furlong, 660 F.3d 81, 87 (1st Cir. 2011) ("Once an asset is referenced on a schedule, § 521(a)(1) does not specify the level of detail with which that asset must be described.") The First Circuit has stated that "generally, an asset is adequately scheduled if its description exhibits 'reasonable particularization under the circumstances.'" Id. (quoting In re Mohring, 142 B.R. 389, 394-95 (Bankr. E.D. Cal. 1992)). Because part of a trustee's duty is to investigate, "a debtor is required only to 'do enough itemizing to enable the trustee to determine whether to investigate further.'" Furlong, 660 F.3d at 87 (quoting Payne v. Wood, 775 F.2d 202, 207 (7th Cir. 1985)).

In In re Furlong, the debtor had "scheduled" "claims for breach of contract" relating to the sale of a business. At a creditors' meeting, the debtor described related claims sounding in tort. The debtor's complaint raised claims, in addition to breach of contract, of deceit, misrepresentation, breach of the implied covenant of good faith and fair dealing, negligence, breach of fiduciary duty, and violations of consumer protection statutes. The court found that the debtor had described its claims "with reasonable particularity" because it was common

_____

[6] During his deposition, Plaintiff asserted that his asthma was a result of exposure to "bromate pills" put in the bread during the mixing process. (Pl. Dep. at 64, 133-135, 163.) Of course, the present action is a claim under the ADA, and any worker's compensation claim would be a matter under state law for the North Carolina Industrial Commission, not this Court. It is not clear if Plaintiff ever asserted such a claim, or whether he misunderstood the nature of the claim asserted here.

knowledge that such business tort claims "might arise out of the same underlying facts as a claim for breach of contract." <u>Furlong</u>, 660 F.3d at 87.  Moreover, the court noted that the trustee had actual knowledge of these claims because he had reviewed the draft complaint before making the decision to abandon the claims.  <u>Id.</u> at 88.  The court also noted that in <u>In re Bonner</u>, 330 B.R. 880 (6th Cir. B.A.P. 2005), the court found that when the debtors scheduled an "auto accident claim," that was sufficient to describe a personal injury suit arising out of the accident because "it was common knowledge that a personal injury suit could arise out of the same underlying facts, and the trustee was on notice to investigate."  <u>Furlong</u>, 660 F.3d at 87.

In <u>Tilley v. Anixter Inc.</u>, 332 B.R. 501, 510-11 (D. Conn. 2005), the court found that the debtor's listing of a claim "for back child support" was not sufficient to "schedule" a claim for intentional infliction of emotional distress which arose from the diversion of the income of the person responsible for paying the child support.  The fact that the claim for emotional distress arose out of the failure to pay adequate child support "did not absolve [the debtor] of a duty to schedule it separately from a claim for back child support."  <u>Id.</u>  In the present action there is not even the argument that Plaintiff Dixon's ADA claim arose out of any "workers compensation" claim.

Finally, in a recent case in the District of Maryland, the court considered a case very similar to the present case, where the "plaintiff listed a 'pending Worker's Compensation Settlement,'" on her bankruptcy petition schedules, but "she did not disclose her discrimination lawsuit" against her employer.  <u>Jones v. Safeway, Inc.</u>, No. 1:12CV3547, 2014 WL 6871586 (D. Md. Dec. 3, 2014). In considering whether Plaintiff could still pursue the discrimination lawsuit,

the court noted that "a discrimination lawsuit, and the underlying facts of the discrimination claim, are intangible assets that must be disclosed to the bankruptcy court in a voluntary bankruptcy petition," and "only the bankruptcy trustee - as the representative of the bankruptcy estate - may pursue causes of action that belong to the bankruptcy estate, even if those causes of action were not disclosed to the bankruptcy court." Id. In that case, the Court concluded that the plaintiff had not disclosed the existence of the employment discrimination lawsuit, and had not shown abandonment of the claim by the trustee.[7]

Taking these cases as a guide, Plaintiff Dixon did not describe his claims under the American with Disabilities Act with reasonable particularity by "scheduling" a "workers compensation" action. First, a claim for workers compensation is not normally associated with a claim under the ADA, and thus would not give a trustee notice to investigate. Second, this is a motion for summary judgment, and Plaintiff Dixon has not carried his burden of pointing to evidence that he revealed the true nature of the pending action to the trustee or the bankruptcy court. The affidavit of the trustee, Mr. Schafer, shows that he knew only of the "workers compensation" claim prior to Plaintiff's discharge. (Aff. of Gerald Schafer [Doc. #15-1].) The

---

[7] The court in Jones ultimately allowed Plaintiff 30 days to seek reopening of the bankruptcy proceeding in order to amend the schedules and disclose the discrimination claims, so that the trustee would have the opportunity to intervene in the lawsuit, to authorize continuation of the action, or to abandon the claim. Following entry of the court's order, the trustee moved to reopen the bankruptcy proceeding, the plaintiff amended the schedules to add the discrimination lawsuit, the plaintiff attempted to claim the lawsuit as exempt, and the trustee and employer objected, contending that the claim was not exempt and that any proceeds belonged to the bankruptcy estate. The court stayed the case so that the bankruptcy court could resolve the issue of whether the claim was exempt. See Jones v Safeway, 1:12CV3547, Order dated March 18, 2015; see also Evans v. Allied Air Enters., Inc., No. 5:10-2029-MBS, 2011 WL 4548307 (D.S.C. Sept. 30, 2011) (allowing trustee to intervene after plaintiff inadvertently omitted a wrongful termination claim from bankruptcy court filings and applying judicial estoppel to preclude plaintiff's claims asserted on his own behalf).

trustee states that <u>after</u> the discharge he was informed "that the action involving the Defendant was seeking lost wages and other damages in violation of the Americans with Disabilities Act." (<u>Id.</u>) He then investigated and decided not to reopen the bankruptcy case. (<u>Id.</u>) Plaintiff Dixon submitted an affidavit also, but it does not state that he revealed in open court that his "workers compensation" action was actually one under the ADA. (Aff. of Pl. [Doc. #15-2].) Therefore, unlike in <u>In re Furlong</u>, there is no evidence that either the trustee or the bankruptcy court knew the true nature of Plaintiff's "workers compensation" action.

Third, it is significant that Plaintiff Dixon failed to provide identifying case information, such as the caption of the suit, the case number, and the court location, even though the schedule called for such information. If Plaintiff had included information that the action was pending in federal court, an unusual venue for a workers' compensation action, it may have put the trustee on notice to investigate further.

Fourth, mislabeling this action as a workers compensation action may have misled someone reviewing Plaintiff's Petition to a greater degree than if the action were mislabeled as another type of employment discrimination action. This is so because "courts have generally held that workers' compensation benefits are exempt under" either 11 U.S.C. § 522(d)(10)(C) or (d)(11)(D) or (E). <u>In re Williams</u>, 181 B.R. 298, 300 (Bankr. W.D. Mich. 1995); <u>see</u> <u>In re Sanchez</u>, 362 B.R. 342, 356 (Bankr. W.D. Mich. 2007) (finding that claim of workers' compensation itself as well as the right to receive a weekly benefit as a result of the claim fall within scope of exemptions); <u>In re Michael</u>, 262 B.R. 296, 298 (Bankr. M.D. Pa. 2001) ("Workmen's compensation benefits, however, have been held to be exemptible

under § 522(d)(10)(C).") Indeed, in his Claim for Property Exemptions, under the section for listing "Other Exemptions Claimed Under the Laws of the State of North Carolina," Plaintiff listed "Worker's Compensation benefits, N.C. Gen. Stat. § 97-21." (Petition [Doc. #13-1] at 15.) The parties do not claim that a similar exemption would apply to any recovery for violations of the ADA. Finally, Plaintiff Dixon has not pointed to any case in which a court has found that upon facts similar to the present action the debtor sufficiently described the pending action.

For all of these reasons, Plaintiff Dixon failed to properly "schedule" this action in his bankruptcy Petition. This action is therefore "unscheduled property" in the bankruptcy proceeding. Unlike "scheduled" property, "unscheduled" property is not deemed to be abandoned automatically upon the closing of the bankruptcy case. See 11 U.S.C. § 554(c) & (d); Parker v. Wendy's Int'l, Inc., 365 F.3d 1268, 1272 (11th Cir. 2004) ("Failure to list an interest on a bankruptcy schedule leaves that interest in the bankruptcy estate."); In re Lehosit, 344 B.R. 782, 784 (Bankr. N.D.W. Va. 2006) ("Thus, if property was not properly scheduled by a debtor, it is not abandoned when the bankruptcy case is closed."); In re Ahearn, 318 B.R. 638, 642 (Bankr. E.D. Va. 2003) ("Courts in the Fourth Circuit have consistently required a prior, formal scheduling of an asset in order for that asset to be abandoned at the close of the case under § 554(c).").

It is Plaintiff Dixon's burden to show that property has been abandoned. Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974). The property was not abandoned by virtue of Plaintiff Dixon's order of discharge and closing of the case, as seen from the above discussion. Plaintiff Dixon has not shown that the trustee followed any of the requirements of

-15-

Federal Rule of Bankruptcy 6007 regarding giving notice of a proposed abandonment.[8]  Finally, the affidavit of Trustee Schafer does not mention abandonment, and there is no bankruptcy court order regarding the abandonment of this action.  Therefore, Plaintiff Dixon has not carried his burden of showing that there was an abandonment of the claims raised in this case.[9]  Because this action became property of Plaintiff Dixon's estate and remains so, Plaintiff Dixon has no legally cognizable right in it and he cannot pursue these claims here.  Therefore, Defendant's first Motion for Summary Judgment will be granted.

### C.      Second Motion for Summary Judgment

#### 1.      Plaintiff's Claim for Discriminatory Discharge

Moreover, even if Plaintiff could present his claim here, the Court nevertheless concludes that Plaintiff has failed to present a genuine issue of material fact in support of his claims.  In this regard, Defendant's Second Motion for Summary Judgment seeks dismissal of Plaintiff's claims on the merits.  In his Complaint, Plaintiff first argues that Defendant violated the ADA

---

[8] "Property may not be abandoned by the trustee unless the procedures set forth [in] Rule 6007 are followed."  Lehosit, 344 B.R. at 784.

[9] There is a procedure whereby a debtor may seek to reopen the bankruptcy case, to give the trustee an opportunity to pursue or abandon a cause of action.  However, there is no showing that Plaintiff has sought to reopen his case.  See 11 U.S.C. § 350(b) (allowing for the reopening of a case to administer assets, to accord relief to the debtor, or for other cause); Lehosit, 344 B.R. at 784 ("Even after a case is closed, an estate continues to retain its interest in unscheduled property.  One consequence of this principle is that a debtor may be unable to assert a cause of action after the bankruptcy if the cause of action was not scheduled.  Therefore, before a debtor seeks to enforce such a cause of action, he may be required to reopen the bankruptcy case, in order to give the trustee an opportunity to pursue or abandon the cause of action.") (internal citations omitted).  Moreover, it appears that even if Plaintiff did pursue this option, the claim would become property of the bankruptcy estate and, absent an exemption, any recovery would inure to the benefit of Plaintiff's creditors.  It does not appear that Plaintiff or the Trustee seeks to pursue this option.  Nevertheless, as a result of this possibility, and in the alternative to the extent Plaintiff contends that he holds the interest in the present claims, the Court has proceeded to consideration of the second Motion for Summary Judgment.

by discriminating against him by terminating his employment. (Compl. ¶ 21(a) & (b).) Discriminatory discharge claims under the ADA are analyzed under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995) ("[W]e hold that the McDonnell Douglas scheme of proof does apply to appropriate claims under the ADA"). Plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. Id. If he is successful, the burden shifts to Defendant to articulate some legitimate, non-discriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. Id. If Defendant meets this burden of production, the presumption created by the *prima facie* case drops out of the case, and Plaintiff bears the burden of proving that he has been the victim of discrimination. Id. To establish his *prima facie* case, Plaintiff must show: (1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination. Id.; Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001).

Defendant does not challenge Plaintiff's allegation that he was an individual with a disability under the first element of the test or that he was discharged. However, Defendant argues that Plaintiff has failed to establish the third element of the *prima facie* test–that he was fulfilling his employer's legitimate expectations at the time of discharge. (Def.'s Mem. [Doc. #25] at 17-18.) There is no dispute that Plaintiff received numerous disciplinary write-ups and

unfavorable performance evaluations as set forth above. Plaintiff does not directly address this element of the test in his brief. Rather, he addresses whether he was "otherwise qualified" for his position. (Pl.'s Mem. [Doc. #28] at 6.) In connection with that argument, Plaintiff claims that he only had problems with "David Moore." (Id.) However, his supervisors were Rod Moore and David Chapman. It is therefore not clear to whom Plaintiff refers. Nevertheless, as seen from the above facts, Plaintiff's performance problems were documented no less than 9 times between 2005 and 2009.[10] (DeBlaker Decl. [Doc. #23 Ex. C] Ex. 5(a) - (i).) Rod Moore wrote one of these reports and David Chapman wrote two of them. Therefore, Plaintiff's argument that he only had problems with one supervisor is belied by the record. David Chapman states in his declaration that he "had to spend much more time with [Plaintiff] than any other employees [he] supervised, given his performance problems," and that he "never had to discipline any other Production Technician for performance-related issues as significant as [Plaintiff's] during the entire time [he has] been a Production Supervisor." (Chapman Decl. at 8-9.) There is nothing to dispute this statement.

Plaintiff also contends that "[m]any employees had batches of bread with errors and did not lose their positions as a result." He relies upon his deposition testimony to establish this point. However, on the pages he identifies, Plaintiff alleges only generally that supervisors did not perform their duties properly and got into trouble for it, and that supervisors made mistakes

---

[10] Plaintiff contends that he had an asthma attack during the March 4, 2009, incident. He does not attribute the other incidents resulting in unfavorable performance reports to his disability. Even if that one incident is not considered, the remaining incidents show that Plaintiff was not fulfilling his employer's legitimate performance expectations at the time of his discharge.

causing the loss of product but were not written-up for it. (Pl.'s Dep. [Doc. #28-1] at 63, 79, 105.) He does not offer any specific information on these incidents or allege that other production technicians such as himself lost product without being disciplined. At deposition, Plaintiff admitted that he had no personal knowledge of employees not being terminated after accumulating the required number of counselings. (Pl.'s Dep. at 151-53.) Accordingly, Plaintiff has not established that he was fulfilling his employer's legitimate performance expectations at the time of his discharge.

Plaintiff also fails to explain which circumstances of his discharge raise a reasonable inference of unlawful discrimination, in satisfaction of the final element of the *prima facie* test. For many of the same reasons that he cannot show that he was meeting the legitimate performance expectations of Defendant, Plaintiff fails to show such circumstances that raise a reasonable inference of discrimination. Plaintiff has therefore failed to establish two of the elements of the *prima facie* test.[11]

---

[11] Plaintiff also claims in his Complaint that Defendant discriminated against him in violation of the ADA by filling his position with someone from outside of the protected class. (Compl. [Doc.#4] ¶21(c).) His Complaint does not identify this person. It simply states that "[u]pon information and belief, Plaintiff was replaced by an employee outside of the protected class and with less experience." (Id. ¶ 4.) Plaintiff does not address this allegation in his memorandum, and such a contention would not generally be part of the consideration in an ADA case. In any event, Defendant 's evidence is that following Plaintiff's discharge, it did not hire any other production technician to replace him, and instead covered his position through job rotation by other production technicians. Mr. John Dupree performed Plaintiff's job immediately after Plaintiff left. Mr. Dupree had worked in the mixing area but presented a note requiring a weight restriction that prevented him from doing the mixer job. Therefore, Defendant moved him to the bread line where Plaintiff had worked. (DeBlaker Decl. at 6.)

2.     Plaintiff's Claim for Discrimination by Denying Reasonable Accommodation

Plaintiff also claims in his Complaint that Defendant discriminated against him in violation of the ADA by denying the reasonable accommodations of allowing him to keep his inhaler in his work area and providing proper ventilation.  (Compl. ¶ 21(d).)

To state a claim of failure to accommodate, Plaintiff must show that: (1) he was disabled; (2) Defendant had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) Defendant refused to make such accommodations.  Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013).  An accommodation is reasonable "unless [the employer] can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).  "The ADA imposes upon employers a good-faith duty to engage with their employees in an interactive process to identify a reasonable accommodation.  This duty is triggered when an employee communicates her disability and desire for an accommodation—even if the employee fails to identify a specific, reasonable accommodation.  However, an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position."  Jacobs v. N.C. Admin. Office of the Courts, ___ F.3d ___, 2015 WL 1062673, at *17 (4th Cir. March 12, 2015) (internal citations and quotations omitted).  "The burden of identifying an accommodation that would allow a qualified individual to perform the job rests with the plaintiff, as does the ultimate burden of persuasion with respect to demonstrating that such an

accommodation is reasonable. Once the plaintiff has met his burden of proving that reasonable accommodations exist, the employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." <u>Lamb v. Qualex, Inc.</u>, 33 F. App'x 49, 59 (4th Cir. 2002) (internal citation omitted).

To the extent that Plaintiff claims in his Complaint that Defendant failed to accommodate him by failing to allow him to keep his inhaler with him, Plaintiff stated during his deposition that he was allowed to keep his inhaler with him in his pocket at his work station. (Pl.'s Dep. at 17.) Therefore, that claim has no merit.

Plaintiff may have meant to claim in his Complaint that Defendant had rejected his request to use the inhaler <u>chamber</u> at his work station, as he argues in his memorandum. (Pl.'s Mem. at 4; Pl.'s Dep. at 119.) According to Plaintiff, manufacturing manager Moore told him about 3 or 4 weeks before he was discharged that he could not have the breathing chamber at his work station, but was allowed to keep it in his locker. (Pl.'s Dep. at 17-19.) Plaintiff says he was told he could not have it because it violated the brittle plastic policy (<u>id.</u>), whereas Mr. Moore states that he told Plaintiff he could not keep a "big plastic tube" at his work station because it appeared to shoot a vapor mist into the air and could contaminate the bread. (Moore Decl. ¶ 24.)

Plaintiff has failed to show that Defendant denied him a reasonable accommodation when it allowed him to use his inhaler at his work station, but required that he keep his breathing chamber in his locker. There is no evidence that having access to the breathing chamber at his work station would have made any difference in any of the incidents at issue in this case. With

respect to the one disciplinary incident in which Plaintiff claims he had to leave his work station due to his asthma, it was to use his nebulizer and not his breathing chamber. There is no evidence that Plaintiff requested to use the nebulizer at his work station, and the uncontradicted evidence is that the nebulizer could not be used in the work station area due to a lack of electrical outlet and a risk of contamination of the bread.

To the extent Plaintiff contends that Defendant failed to accommodate his disability by failing to provide proper ventilation, Defendants' evidence is that during winter months the company turned off the air intake pumps at the ceiling of facility because keeping them on allowed cold air into the building which reduced the quality of the bread and created the possibility of contamination of the bread products. (Id. ¶ 22.) Plaintiff has not presented any evidence to dispute Defendant's showing that allowing cold air into the building resulted in these negative effects. Plaintiff also has not disputed Defendant's showing that it made fans available to employees and that Plaintiff never requested to use a fan at his work station. (Id. ¶ 23.) The question is whether under these circumstances Defendant was required to keep the air intake pumps on as a reasonable accommodation.

Plaintiff has not pointed to any authority finding that a similar accommodation would be reasonable, and the Court has found none. It is not reasonable to expect a company in the business of producing bread to take steps which would present a substantial risk of reducing the quality of the bread and of contaminating the product.

Finally, Plaintiff testified during his deposition that he had asked Mr. Moore for a transfer to the shipping department shortly before his last two write-ups, but his request was denied.

(Pl.'s Dep. at 122.)  Plaintiff did not know whether a position in shipping was open, however. (Id. at 124.)  He has not presented any evidence of an open position.  Moreover, such a transfer would have been to a completely different position in a different department, and Plaintiff contends that he was told he had too many write-ups to be considered for a transfer.  Plaintiff does not dispute this.  Based on the evidence presently before the Court, Plaintiff has failed to show that Defendant is liable for denying him reasonable accommodations for his disability.

III.    CONCLUSION

For the reasons discussed above, the Court concludes that Plaintiff's First Motion for Summary Judgment should be granted.  The Court further finds, and concludes alternatively, that Plaintiff has failed to present sufficient evidence to create a genuine issue of material fact in support of his claims.

IT IS THEREFORE ORDERED that Defendant Flowers' Motions for Summary Judgment [Doc. #12, #23] are GRANTED, and this action is DISMISSED.

This, the 8th day of April, 2015.

/s/ Joi Elizabeth Peake
United States Magistrate Judge
